UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| |
STATE FARM FIRE AND CASUALTY COMPANY,    |     Case No. 1:07-cv-1088

Plaintiff,     |     HONORABLE PAUL L. MALONEY

v.     |

LIBERTY INSURANCE UNDERWRITERS, INC.,     |

Defendant.     |

## OPINION and ORDER

**Granting in Part and Denying in Part the Plaintiff's Motion for Summary Judgment;
Denying the Defendant's Motion for Summary Judgment;
Directing the Parties to File a Notice Advising the Court How they Wish to Proceed**

### OVERVIEW

Henry Bouma ("Bouma") founded Lumbermen's, Inc. ("Lumbermen's") about 50 years ago and at the time relevant to this case, he was CEO and Chairman of the Board. On a Saturday in September 2005, Bouma was driving a vehicle jointly leased to him and Lumbermen's when he accidentally struck and seriously injured a pedestrian. The pedestrian settled her claims for $9 million. Bouma's own automobile liability insurer paid its $1 million policy limit without reservation of any rights, and it is not a party to this action.

That left $8 million to be paid. The plaintiff, State Farm Fire and Casualty Company ("State Farm"), paid $3 million, its limit under the personal liability umbrella policy issued to Bouma. The defendant, Liberty Insurance Underwriters, Inc. ("Liberty"), paid the remaining $5 million, under a $10 million commercial liability umbrella policy that it issued to Lumbermen's. Both State Farm

and Liberty reserved their right to seek a declaration in federal court that a different allocation of liability might be appropriate.

State Farm concedes that Bouma was the named insured under its personal-liability policy and that it is liable for some portion of the settlement.

The dispute is over whether defendant Liberty is also liable, under a commercial umbrella liability policy that it issued to Bouma's employer, Lumbermen's. State Farm seeks a declaration that Liberty's policy provides coverage, and that the two insurers must pay *pro rata* in proportion to their respective policy limits. Liberty seeks a declaration that Bouma was not an insured under its policy.

Alternately, Liberty contends that even if Bouma was an insured under its policy, State Farm's policy is merely a pro rata policy, while Liberty's is a true "excess" policy, such that Liberty was not obligated to pay anything until State Farm paid its $3 million policy limit.

**There are two issues regarding defendant Liberty's liability for contributing to the settlement. First, under Michigan law, was the driver of the vehicle, Bouma, an insured based on his conduct at the time of the accident?** The parties agree that this depends on whether he was acting, in the language of Liberty's policy, within his duties for his employer, Lumbermen's (the policyholder). Bouma's deposition testimony tends to support the conclusion that he was acting within the scope of his (self-appointed) duties as CEO and Chairman of the Board of Lumbermen's, but that conclusion is not ineluctable.

Liberty counters with roughly equally sound reasoning and evidence that Bouma should not be considered to have acted within the scope of his duties during the Ann Arbor trip. For example, there was conflicting evidence as to whether Bouma would have used the Lumbermen's company

-2-

credit card to pay for dinner if the party had made it safely to the game. Bouma claims that he would have charged dinner to the company, *see* Bouma Dep at 87. But if Morehouse is to be believed, the couples' past pattern and practice did not lead to a solid inference that Bouma/Lumbermen's would have paid for dinner: Morehouse explained that when the two couples got together, sometimes Morehouse paid for dinner, sometimes Bouma paid for dinner, and sometimes the couples split the bill. *See* Morehouse Dep 14:21-25.

Moreover, it is undisputed that Bouma personally paid for the tickets to the game on the day of the accident, not Lumbermen's. Bouma explained, however, that for a period of about 14-15 years, Lumbermen's had purchased the University of Michigan football season tickets, and stopped doing so only when an IRS agent, in the course of an audit, suggested they not do so. Since that time, and for 14-15 years prior to his May 2008 deposition, Bouma advanced his own money for all the tickets. *See* Bouma Dep at 31:5 to 32:15. Bouma stated that he had "taken just about every one of our managers to a football game over the years, retired and active." Bouma Dep 32:15-17. The record does not reflect whether Lumbermen's ever reimbursed Bouma for the cost of game tickets or attendant entertainment, meal, and travel expenses.

And Morehouse testified that they and their wives were long-time close personal friends, and that they "typically" and "regularly" discussed Lumbermen's personnel and the lumber business, even at social gatherings where the business purpose was "incidental." *See* Morehouse Dep 14:2-15. (That was not surprising, given that they met in the business, Morehouse worked for Bouma, and Morehouse worked in the business for decades before joining Lumbermen's). Liberty argues, reasonably, that the parties could not have intended that every get-together between a Lumbermen's officer and a personal friend who worked, or used to work, in the lumber business, would be

considered "within the scope of the officer's duties" and therefore covered by the Liberty policy. *See* Liberty's Opp at 2.

Thus, this court will <u>not</u> hold that as a matter of law, Bouma was or was not "acting within the scope of his duties" at the time of the accident, i.e., whether he was an insured at the time of the accident as defined by the Liberty policy.[1]  On this record, whether Bouma was acting within the scope of his duties for Lumbermen's is an issue for a properly instructed jury.  But fashioning jury instructions acceptable to the Michigan Supreme Court will be a significant challenge.  No binding authority has been found.  For example, the jury instructions might adopt the test of Idaho, which asks whether the employee was "furthering the interests" of the employer at the time of the accident. However, this court might deem some qualifier appropriate, such as whether the *primary* purpose of the trip was to further the interests of the employer.

**The second liability issue is whether the "excess coverage" clauses of the State Farm and Liberty policies render the State Farm policy primary vis-a-vis Liberty's policy under Michigan law.**  State Farm's excess clause also used the term "pro rata" – though not in the customary location within the policy, or in the customary sense – while Liberty's policy had merely an "excess" coverage clause and never mentioned the words "pro rata."  Nonetheless, the court

---

[1]

State Farm argues that "Liberty does not challenge Mr. Bouma's credibility or suggest any incentive on his part to fabricate his testimony.  The present dispute is between his insurers, and the underlying litigation is fully and finally resolved." State Farm's Reply at 5 n.4.  This is a reasonable argument, but not one that bolsters the case for summary judgment.  State Farm's argument goes only to Bouma's credibility, which is a matter reserved for the jury at trial.  In Michigan, "The court is not permitted to assess credibility, or to determine facts on a motion for summary judgment." *White v. Taylor Dist. Co., Inc.*, 739 N.W.2d 132, 138 (Mich. App. 2007) (quoting *Skinner v. Square D Co.*, 516 N.W.2d 475, 480 (Mich. 1994) (citing *Zamler v. Smith*, 135 N.W.2d 349 (Mich. 1965))), *aff'd*, 753 N.W.2d 591 (Mich. 2008).  *Accord Coburn v. Rockwell Automation*, 238 F. App'x 112, 126 (6th Cir. 2007) (Richard Allen Griffin, J.) ("This boils down to a credibility determination, the very type of determination that courts may not resolve on summary judgment.").

determines that there is no genuine issue as to the interplay between the two policies: both policies are excess policies, putting them in the same "layer" of coverage, so neither is primary to the other.

**That means that if Bouma was an insured under Liberty's policy, State Farm and Liberty will share responsibility for the remainder of the settlement pro rata, i.e., each will pay according to its policy limit's proportion of the two insurers' combined policy limit.** Liberty will be obligated to reimburse State Farm for the amount that State Farm has paid above its obligation. Michigan law provides that under a pro rata policy clause, the insurers are liable in proportion to their policy limits. It is undisputed that State Farm's policy limit is $3 million and Liberty's policy limit is $10 million, so State Farm would be liable for 3 thirteenths and Liberty would be liable for 10 thirteenths of the remaining settlement amount. In other words:

| | | | | |
|---|---|---|---|---|
| State Farm would be liable for: | 3 / 13 | x | $8 million = | $1,846,154 |
| Liberty would be liable for: | 10 / 13 | x | $8 million = | $6,153,846 |

Because State Farm already paid its $3 million policy limit towards the settlement, Liberty would owe State Farm $3 million minus about $1,846,154 = about $1,153,846. State Farm also seeks interest on that amount.

## BACKGROUND

On a Saturday in September 2005, four people were traveling to Ann Arbor to attend a football game between the University of Michigan Wolverines and the Notre Dame Fighting Irish. Henry Bouma, the founder and Chairman of the Board of Directors of Lumbermen's, was driving the vehicle, which was jointly leased to Bouma and Lumbermen's. In the vehicle were three other passengers: Robert Morehouse, former long-time Vice-President of the Grand Rapids Division of Lumbermen's, who had recently retired; Bouma's wife; and Morehouse's wife. It is undisputed that

the Boumas and the Morehouses are close personal friends, but it is also undisputed that Bouma intended to discuss, and the two men did discuss, specific lumber business during the trip.

They stopped at a rest area, the women exited the vehicle, and the men remained in the vehicle talking.  After some time, Bouma decided to exit the vehicle, but he did not put the vehicle in "park."  Bouma opened the door and tried to put his foot on the brake, but he hit the accelerator instead; the car jumped forward over the curb and struck a 45-year-old woman, who sustained serious permanent injuries.

**Three potentially relevant insurance policies were in effect at the time of the accident.**

First, Bouma's vehicle was co-leased to him and his company, Lumbermen's, Inc. ("Lumbermen's").  It was insured by Old Republic Insurance Company policy number MWTB-19118, with a limit of $1 million and a coverage period of February 1, 2005 to February 1, 2006. Old Republic is not a party to this action.

Second, Lumbermen's itself had a commercial umbrella liability policy from defendant Liberty Insurance Underwriters, Inc. ("Liberty"), number LQ1B71O786O6O42, with a limit of $10 million and a coverage period of February 1, 2005 to February 1, 2006.  The Liberty policy required Lumbermen's to have a separate primary automobile liability insurance policy with a $1 million combined single limit.

Third, Bouma himself had a personal liability umbrella insurance policy from plaintiff State Farm Fire & Casualty Company, Inc. ("State Farm"), number PN22-K5-8304-5, with a limit of $3 million and a coverage period of December 31, 2004 to December 31, 2005.

The Settlement with the Injured Person.

In December 2006, facilitative mediation resolved the claims of the injured person (who is

not a party to this action) and her family against driver Bouma and his company, Lumbermen's.[2] The injured person agreed to accept $9 million in full and final settlement of all claims. Old Republic, which insured Bouma's car, paid its $1 million policy limit, leaving $8 million to be paid. State Farm paid its $3 million policy limit, and Liberty paid the remaining $5 million, and they agreed that this allocation of responsibility was provisional and subject to State Farm's right to seek declaratory judgment in federal court.

## DIVERSITY JURISDICTION

The complaint presents no federal question, so diversity is the only basis for the court's jurisdiction. When sitting in diversity jurisdiction, this court must apply the choice-of-law rules and, if applicable, the substantive law of the forum State, Michigan. *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp.2d 888, 897 (W.D. Mich. 2008) (Paul L. Maloney, C.J.) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409-10 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003))); *see also Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). This rule applies in insurance-coverage actions brought in diversity. *See Amerisure*, 578 F. Supp.2d at 897 (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 536, 563 (6th Cir. 2008) (citing *Talley v. State Farm Cas. & Fire Co.*, 223 F.3d 323, 326 (6th Cir. 2000))).

When interpreting contracts in a diversity action, the federal courts also generally enforce the parties' contractual choice of governing law. *Amerisure*, 578 F. Supp.2d at 897 (citing *Savedoff*,

---

[2]The terms of the settlement are confidential, but the parties have disclosed the amount to the court via sealed document.

524 F.3d at 762 (citing *Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 596 (1991) and *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972))).  As the parties do not dispute that the interpretation of the policies is governed by Michigan substantive law, the court applies Michigan law to this dispute.  *See, e.g., Savedoff*, 524 f.3d at 762 ("As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute."); *Amerisure*, 578 F. Supp.2d at 897 ("As the parties do not dispute that the Amerisure-Carey policy is governed by Michigan substantive law, the court applies Michigan law to this dispute.").

## A FEDERAL COURT'S APPLICATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)).  If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'"  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it.  There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them.

-8-

In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . .").

In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605.

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")).  If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *King v. Order of United Commercial Travelers*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis."  This subsection makes no distinction based on when the decision was issued..  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals

-9-

must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." . *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound

-10-

in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2D COURTS § 225 (1965).  As our Circuit recently emphasized,

> No federal court has the final say on what [state] law means.  Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*15.  *See, e.g., MPAS v. MDOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

The Policies' "Excess" Coverage Clauses

**The State Farm-Bouma personal liability umbrella policy's excess clause provides,** This policy is excess over all other valid and collectible insurance.  When like coverage is written in another company, we will share in payments on a pro rata basis.

State Farm's MSJ at 4 (quoting Ex 2, State Farm Policy, Item 5 & Endorsement FE760.1).

-11-

**The Liberty-Lumbermen commercial umbrella liability policy's excess clause provides,**

> If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance.  Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

State Farm's MSJ at 4-5; *see* Liberty's MSJ, Ex 1.

<u>Is Bouma an Insured under the Liberty Policy?</u>

State Farm contends that Bouma is an insured under the Liberty-Lumbermen policy, which defines the term "insured" to include, in pertinent part,

> 6.      Any of your [Lumbermen's] partners, executive officers, directors, or employees but only while acting within the scope of their duties.

> However, the coverage granted by this Provision 6 does not apply to the ownership, maintenance, use, "loading" or "unloading" of any "autos," "aircraft" or "watercraft" unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and for no broader coverage than is provided under such underlying policies.

> * * *

> 8.      Any person (other than your partners, executive officers, directors, stockholders or employees) or organizations with respect to any "auto" owned by you, loaned to you or hired by you or on your behalf and used with your permission.

It is undisputed that driver Bouma was one of policyholder Lumbermen's "executive officers, directors, or employees" at the time of the accident, so coverage under the Liberty policy depends on whether he was "acting within the scope of [his] duties" at that time.   Liberty contends that its commercial umbrella liability policy was issued *to Lumbermen's alone*, not to Lumbermen's officer Bouma, and that Bouma was driving the vehicle for personal use, not for Lumbermen's business, at the time of the accident, so he was not "acting within the scope of [his] duties" on the trip to Ann Arbor with the Morehouses.

-12-

**The court's first task is to discern the meaning of the Liberty policy's definition of an insured, which includes Lumbermen's officers when "acting within the scope of their duties."**

In Michigan, insurance policies are subject to the same rules of interpretation that apply to contracts in general. *Sherman-Nadiv v. Farm Bur. Gen. Ins. Co. of Michigan*, 2008 WL 4958691, *2 (Mich. App. Nov. 20, 2008) (p.c.) (P.J. Jansen, O'Connell, Owens) (citing *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005)). A contract must be interpreted according to its ordinary and plain meaning, *Holmes v. Holmes*, 760 N.W.2d 300, 311 (Mich. App. 2008) (P.J. Bandstra, Beckering, Gleicher) (citing *St. Paul Fire & Marine Ins. Co. v. Ingall*, 577 N.W.2d 188, 191 (Mich. App. 1998) (P.J. McDonald, Saad, Smolenski)), avoiding technical or strained constructions, *Ingall*, 577 N.W.2d at 191. A Michigan court's interpretation of contractual language is further guided by the following precepts:

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning.

*Holmes*, 760 N.W.2d at 311 (quoting *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 407 (Mich. App. 1997) (P.J. Young, Taylor, Cir. J. Livo) (internal citations omitted)).

The Michigan Court of Appeals recently provided helpful guidance for courts seeking to discern "the ordinary and plain" meaning of a term that is left undefined by a statute or contract. The panel explained,

> When the word . . . appears in a contract of insurance and it is not defined in the policy, it must be construed in a manner most likely to correspond to the intention of the parties to the contract. The intention fairly attributable to the insurer and the insured, from an objective standpoint and in the absence of a contrary indication,

> *should therefore reflect the ordinary meaning of the word as it is understood by persons generally and should highlight the characteristics which the law most often attributes to employment.*

*Bertrand v. Pacific Employers Ins. Co.*, 2001 WL 1464524, *2 (Mich. App. Nov. 16, 2001) (quoting *Am. Cas. Co. v. Wypior*, 365 F.3d 164, 166-67 (7th Cir. 1966) (emphasis in original)).  "The 'ordinary meaning of the word as it is understood by persons generally' is captured best in the dictionary definitions . . . ."  *Bertrand*, 2001 WL 1464524 at *2.

**The first step in applying Liberty's policy term "acting within the scope of their duties", then, is determining whether it is ambiguous.**  When the words used by the parties are clear and ambiguous and have a definite meaning, the court may not look to parol or other extrinsic evidence to determine the parties' intent.  *Zurich Ins. Co. v. CCR & Co.*, 576 N.W.2d 392, 395 (Mich. App. 1997) (citing *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (1941)).  The Liberty-Lumbermen's policy does not define the term "acting within the scope of their duties", and it is not obvious or readily inferrable from other terms in the policy what the parties intended the term to encompass.  But this does <u>not</u> necessarily mean that the term "acting within the scope of their duties" is ambiguous, let alone that such ambiguity warrants construing the term in favor of the insured (against Liberty).  *See Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616 (Mich. 2004):

> The dissent asserts that the term 'owned', because it is undefined in the policy, must be construed against the drafter.  We disagree.  As we recently explained in *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 663 N.W.2d 447 (2003), the rule of *contra proferentem* is a rule of last resort that does not apply unless (1) there is a true ambiguity and (2) the parties' intent cannot be discerned.  A word is not ambiguous merely because different dictionary definitions exist.  *Koontz v. Ameritech Servs., Inc.*, 466 Mich. 304, 317-18, 645 N.W.2d 34 (2002).  The word "owned" is not ambiguous as used in the policy.  Rather, we conclude that the plain and ordinary meaning of that word [should control] . . . .

*Id.* at 622 n.6.  Rather than hastily conclude that "acting within the scope of their duties" is

-14-

ambiguous, the court may consult extrinsic evidence and persuasive authorities to discern the plain and ordinary meaning of the term.

No definition of the precise phrase or a very similar phrase is available from binding or persuasive authorities in Michigan.[3]  Although a federal court's interpretation of state law is not binding, *see ARS*, 2008 WL 828112 at *14 (collecting cases), the court has searched for Sixth Circuit Court of Appeals decisions interpreting the term "acting within the scope of their duties" in the insurance context under Michigan law; it appears that there are none.[4]  Likewise, no available Sixth

---

[3]

The Michigan appellate courts have not interpreted the term "acting within the scope of his/her/their duties" in the insurance context. The Michigan Court of Appeals has confronted policies which limit coverage to situations where a policyholder's employee was acting within the scope of his duties, but it resolved the appeal on other grounds without fleshing out the term's parameters.

*See Wilcox v. Munger*, 2007 WL 4463926 (Mich. App. Dec. 20, 2007) (p.c.) (P.J. Davis, JJ. Murphy & Servitto), where the policy failed to define the term and there was no useful extrinsic evidence.  The Court of Appeals simply construed the term against the defendant as the drafter of the policy, and assumed that the term did not exclude coverage, thus triggering the defendant's duty to defend.  *Id.* at *3.  *Wilcox* is inapposite because the panel there had to observe the rule that "the duty to defend arises if the underlying allegations even arguably come within the policy coverage . . . ."  *See Wilcox*, 2007 WL 4463926 at *3 (quoting *Allstate Ins. Co. v. Fick*, 572 N.W.2d 265, 267 (Mich. App. 1997) (citing *Polkow v. Citizens Ins. Co. of America*, 476 N.W.2d 382, 384 (Mich. 1991))).  The instant case concerns not the duty to defend, but the duty to indemnify, which is narrower.  *See Polkow*, 572 N.W.2d at 384 ("the duty to defend is broader than the duty to indemnify") (quoting *Guerdon Indus., Inc. v. Fidelity & Cas. Co.*, 123 N.W.2d 143 (Mich. 1963)).

Another Michigan Court of Appeals panel encountered a commercial general liability policy which defined insured to include "any elective or appointive officer or a member of any board or commission or agency of [the policyholder] while acting within the scope of their duties as such."  *See Swikowski v. Citizens Ins. Co.*, 2000 WL 33421455, *1 (Mich. App. May 2, 2000) (p.c.) (P.J. Jansen, JJ. Collins & Sullivan).  The dispute there, however, concerned only whether the person in question was an "officer" within the intendment of the policy, not whether he was acting within the scope of his duties if he *was* an officer.  *See id.* at *3 ("[T]he trial court did not err in finding that Pacquin was not an 'officer', and thus, was not an insured under the policy issued by Citizens").

[4]

The Sixth Circuit has had three appeals involving a policy with such a definition of

Circuit district-court decisions have interpreted the term "acting within the scope of their duties" in the insurance context under Michigan law.[5]

Thus, in trying to predict how the Michigan Supreme Court would interpret the policy phrase "acting within the course of their duties", the court is left to consult decisions applying the common law of other States governing undefined terms in insurance contracts.  In predicting whether the Michigan Supreme Court would likely find their sister courts' reasoning persuasive, this court is essentially determining which of those decisions is logical, internally consistent, and does not lead to absurd results – and, most importantly, which of those sister-court decisions, if any, employs canons of construction and logical presumptions consistent with Michigan appellate case law.

**State Farm points to a decision from the Supreme Court of Idaho and a decision from the Superior Court of Pennsylvania.  In *Leggett v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 844 A.2d 575 (Pa. Super. 2004), a Pennsylvania trial court reasoned as follows:**

---

"insured", but the appeals were resolved on unrelated grounds.  *See:*

*B'hood Mut. Ins. Co. v. DeLauter*, 1998 WL 432482 (6th Cir. July 17, 1998) (Michigan law) (policy defined insured as named organization as well as "any executive officer, director or stockholder thereof while acting within the scope of his duties as such");

*St. Paul Mercury Ins. Co. v. Huitt*, 336 F.2d 37, 43-45 (6th Cir. 1964) (Michigan law) (policy defined insured as "not only the named insured but also . . . any executive officer, director or stockholder thereof while acting within the scope of his duties as such");

*Portaro v. Am. Guar. & Liab. Ins. Co.*, 310 F.2d 897 (6th Cir. 1962) (Ohio law) ("The term 'insured' included any officer of the named insured, while acting within the scope of his duties", but Circuit resolved dispute by holding that coverage was excluded by a clause providing that a covered "occurrence" did not include an assault and battery committed by an insured).

[5]

*See City of Sterling Heights v. United Nat'l Ins. Co.*, 2004 WL 252091, *8 with n.3 (E.D. Mich. Feb. 11, 2004) (Edmunds, J.) (question was not whether person was acting "within the scope of his/her duties as a public official for the public entity" insured, but whether the conduct fell within a "wrongful act" exclusion), *on recon. in part o.g.*, 2004 WL 5382862 (E.D. Mich. Apr. 9, 2004).

> National Union claims that the term "acting within their duties" is synonymous with the term "course and scope of employment" and as such the court is bound by prior case law defining that term.  We believe that if National Union wanted an exclusion defined under the term of art "within the course and scope of employment", they would have used the term "within the course and scope of employment" rather than saying the insured had to be "acting within [his/her] duties."

*Leggett*, 844 A.2d at 578.

The Pennsylvania court then consulted standard dictionaries in an attempt to construe the term "acting within his/her duties" in its "natural, plain and ordinary sense."  *Leggett*, 844 A.2d at 578.  The Pennsylvania court stated,

> We decline to interpret the policy in the narrow manner suggested by National Union.  The trial court determined, most appropriately for the purposes of this case, "duty" to mean: "Obligatory tasks, conduct, service or functions that arise from one's position (as in life or in a group)."  Webster's Ninth New Collegiate Dictionary (1990).  We note, too, that Black's Law Dictionary (5th ed. 1979) defines "duty" in relevant part as a "legal or moral obligation."

*Leggett*, 844 A.2d at 578.  The Pennsylvania court's consultation of a layperson's dictionary and a legal dictionary is consistent with the practice of Michigan courts.  *See Snyder v. Advantage Health Physicians*, – N.W.2d –, –, 2008 WL 4958293, *__ (Mich. App. Nov. 18, 2008) ("'Reasonable diligence' is not defined in the court rule.  We may consult a legal dictionary to define an undefined term that has a specific legal meaning.") (citing *Vodvarka v. Grasmeyer*, 675 N.W.2d 847, 853 (Mich. App. 2003) (P.J. Griffin, Neff, <u>Murray</u>) ("The statute does not contain a definition of the terms 'proper cause' or 'change of circumstances.'  We therefore resort to the dictionary to determine the plain meaning of those words.")).

Moreover, the Pennsylvania court's definition of the word "duty" is consistent with the practice of the Michigan appellate courts, which recently defined "duty" as "[a] legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has

a corresponding right." *Manistee Cty. Intermediate Sch. Bd. v. MASB-SEG Prop. Cas. Pool*, 2005 WL 1048747, *3 (Mich. App. May 5, 2005) (p.c.) (P.J. Fort Hood, Meter, Schuette) (quoting BLACK'S LAW DICTIONARY (7th ed.)).

Returning to the facts of the Pennsylvania case, *Leggett*, the employee sustained an accident, drove to a site in order to find his company-issued cellular phone which he had misplaced.  On the way to and from the site where he hoped to find his company phone, the employee took his children to a retail store and a restaurant.  The Pennsylvania court held that, although these side trips were purely personal excursions, they were secondary to his primary purpose of finding the company phone.  The Pennsylvania trial court reasoned as follows:

> In this case, Leggett drove to Reading to search for a company-owned cell phone which he used for his job.  We agree with Judge Farina that an employee has a duty to search for company property that he lost.  The fact that he did it on a Saturday does not mean that he was any less carrying out a duty of his employment.
>
> It is true that normally one is not acting within the course and scope of his employment commuting to and from work.  However, the situation is different when one makes a separate trip on a normal day off to perform the obligation of finding lost property.  That is more akin to going from one's office to a job site than the regular commuting from home to the office.
>
> The fact that Leggett made and the boys did a Scout project before leaving or made two casual, unplanned stops after lunch does not change the basic nature of the trip to Reading, namely, to look for the lost company-owned cell phone.  The trip was job-related so the property could be recovered and used on the next work day.  We agree with Judge Farina that it is therefore within the "duties" of employment.

*Leggett*, 844 A.2d at 578.  The Pennsylvania Supreme Court affirmed without opinion.  *See Leggett v. NUFIC*, 874 A.2d 1159 (Pa. 2005) (p.c.).[6]

**The Supreme Court of Idaho followed *Leggett* in *Nat'l Union Fire Ins. Co. of Pittsburgh,***

_____

[6]   Only one decision has cited *Leggett* on this issue: the Idaho Supreme Court decision, *Dixon*, which is discussed below.

*Pa. v. Dixon*, **112 P.3d 825 (Idaho 2005)** ("*Dixon*"), which interpreted a policy that defined "insured" as "any of your partners, executive officers, directors, stockholders or employees but only while acting within their duties." The employee in *Dixon* began the evening by acting within the scope of his duties when he took a company-owned vehicle to the gas station to fill the tank in anticipation of a business trip the next day. The employee went outside the scope of his duties after that, however, by visiting a bar and a friend's house and drinking at both locations. On his way home, he missed a stop sign and struck another vehicle, killing its occupants. The Idaho Supreme Court affirmed summary judgment for the insurer, writing as follows:

> The issue in this case is not the company policy concerning alcohol or drugs, as there were conflicting issues of fact concerning the efficacy of those rules. *The issue is whether under this set of facts Dixon was furthering his employer's interests.* Dixon drove the company vehicle into town to refuel for a business trip to occur the following day. Dixon did have an obligation to fill the company vehicle with gas. Dixon, completing an obligatory task or performing a service for his employer, was acting within his duties when he drove the vehicle into New Meadows to fill it with fuel.
>
> However, when Dixon decided to visit two bars and a friend's home he clearly abandoned his employer's objectives and any service remotely connected to his employer. Dixon was not going to work or coming from work after he fueled the company vehicle. Nor was Dixon off at a remote job site at the time the accident occurred. There is no evidence that Dixon returned to any activity remotely connected with his duties of employment. The fact that Dixon was driving home from his frolic did not reengage Dixon into acting within his duties for his employer. The district court did not err in granting summary judgment because as a matter of law Dixon was not acting within his duties at the time of the accident.

*Dixon*, 112 P.3d at 829 (emphasis added) (paragraph break added).

The court believes that the Michigan Supreme Court, applying Michigan's well-established canons of construction, would join the Idaho and Pennsylvania decisions cited in refusing to equate "within the scope of their duties" with the phrase "in the course and scope of their employment."

Beyond that, this court is left to speculate that the Michigan Supreme Court would likely

adopt a rule similar to the rule *Dixon*, 112 P.3d at 829.  Namely, the Michigan Supreme Court would probably hold that one acts within the scope of one's duties when one is furthering the employer's interest, perhaps with the qualifier that the employee's trip or activity must have been *primarily* intended to further the employer's interest.  This is because if furthering the employer's interest were merely a secondary or incidental benefit of the employee's trip or activity, it becomes difficult to believe that the insurer intended to extend coverage so far afield from the workplace and  errands that are either expressly required or fairly-directly-related to work.

**It is not clear, however, whether Bouma's trip to Ann Arbor with Morehouse was "within the scope of his duties", i.e., whether it was primarily or sufficiently focused on "furthering the interests" of Lumbermen's to be within those duties.  A reasonable factfinder could go either way.**

It is true that nobody at Lumbermen's formally "assigned" or required Bouma to discuss lumber matters with Morehouse at any time, let alone during this particular trip.  But as *Leggett* (Pa. Super.) and *Dixon* (Idaho S.Ct.) recognize, not everything an employee does or every trip he takes is expressly required, in so many words, by a superior's directive or by his job description.  So far as the decision reflects, nobody told Leggett, in so many words, that he would be disciplined, or his pay docked, or his evaluation subtly downgraded, if he did not attempt to find the company cell phone that the company had entrusted to him.  But common sense and experience suggest it was reasonable for an employee in Leggett's situation to view finding the cell phone as part of his duties for the employer.

Moreover, in the instant case, Bouma is the founder of Lumbermen's and the Chairman of its Board of Directors, and although the wording is awkward, it is not unreasonable to say that he

can "assign himself" a task for the company.  Indeed, Bouma testified as follows:

> Q.      As the president and then the CEO or chairman you were essentially defining
>         your own job duties and responsibilities?
> A.      Correct.
>
> \*  \*  \*
>
> Q.      Keeping up these relationships again benefits Lumbermen's in your mind?
> A.      Oh, very definitely.
>
> Q.      And it's part of your feelings as to what your job duties were as president and
>         chairman of the board to continue these relationships?
> A.      Yes.

Bouma Dep at 74 and 84-85.  State Farm has a colorable argument that because Bouma was the

founder, CEO and chairman of the Board, there was nobody to "order" or "assign" him to take the

trip in order to maintain the relationship with Morehouse for the sake of the company, but his trip

was no less intended to further the company's interests because of it.  State Farm writes,

> If, for example, as a purely hypothetical matter, an employer told an employee, "I
> want you to take Joe (whether a customer, competitor, associate, client, co-employee,
> etc.) and your wives to a Michigan football game so that you can build, maintain or
> create a relationship that will potentially benefit our business" there is no question
> but that such an 'excursion' as Liberty refers to it would, by definition, be within the
> scope of the employee's duties for his employer.  In the hypothetical, the employee
> would be pursuing the fulfillment of an obligation owed to his employer, furthering
> his employer's interests, and performing a service for his employer.  This is precisely
> what happened in the present case, as Mr. Bouma defined his own duties on behalf
> of the company to include maintaining this particular relationship by these particular
> means.  This was his testimony, and there is nothing on the record presented which
> even remotely contradicts or calls into question his testimony.

State Farm's Reply at 5.

In addition, based on Bouma's testimony, a reasonable factfinder could find that a substantial

and recognized part of Bouma's role in Lumbermen's, and much of his value to Lumbermen's, came

from his ability to cultivate and maintain relationships like the one with Morehouse.  Moreover,

Bouma intended to discuss specific lumber matters with Morehouse on the trip, thereby possibly

gaining information, advice, and future assistance – all with an eye towards advancing the business interest and profits of his employer.  Indeed, State Farm's counsel stated at oral argument, without contradiction from Liberty's counsel, that during the trip, Bouma showed Morehouse samples of some lumber-related material.

The fact that Bouma had also become friends with Morehouse does not negate the significance of these facts.  Bouma founded Lumbermen's in 1955 and served as president or chairman of the board for fifty-two years preceding his retirement in 2007 (the accident occurred in 2005, while he was still chairman of the board).  Bouma Dep at 2, 7, and 66-68.  Bouma testified emphatically and consistently that he is the public face of Lumbermen's, had a special talent for dealing with people in a way that promoted Lumbermen's business, which included meetings in informal settings.  Bouma explained that staff were hired to perform other tasks in order to free him up for such personal networking, tending to current and potential customers (and people, like Morehouse, who might be able to bring in new customers or additional business from existing customers):

> Q.   Anything and everything that would benefit Lumbermen's or that you felt was needed to watch over as the leader of that company, you felt was part of your scope of duties?
>
> A.   Very much so.  I felt that my God-given gift was people.  I love people and consequently my time was more valuable, you know, getting more business and helping our sales force than it was sitting doing the accounting for instance.  We hired people to do that and that's why we hired CPAs in management positions so that they could do some of [the] detailed stuff so I could continue on.
>
> Q.   From listening to you it sounds like the single most-important thing that drove the success of this company during the time that you were president and CEO was not necessarily which brand or line of countertop . . . you carried or which color or colors . . . you carried, but the nature of the relationships that you were able to develop, not only with your employees

but with customers and buyers and others in the community?

A.      100 percent.

Bouma Dep at 76-77.  Bouma gave two examples of how using his abilities in informal settings to maintain relationships with former Lumbermen's employees ended up tangibly benefitting Lumbermen's.  In one case, a former employee referred business to Lumbermen's, and in another case, a former employee returned to Lumbermen's as Sales Manager for the Saginaw Division.  *See* Bouma Dep at 83-85.

Bouma also testified that while he was friendly with the Morehouses, he was also specifically continuing to cultivate the relationship with Morehouse in a way that could tangibly benefit Lumbermen's.  Morehouse had experience, knowledge and contacts that had made him valuable to Lumbermen's in the past and could reasonably be expected to yield results for Lumbermen's in the future.  This is partly because, unlike other Division Managers at Lumbermen's, Morehouse had spent his whole adult life in the lumber business and had worked his way up from manual-labor positions.  Specifically, at age 19 Morehouse began work nailing pallets at the Blue Diamond Lumberyard in Battle Creek, Michigan, then spent 20 years there working his way up to Manager of Sales and Operations.  After leaving Blue Diamond, Morehouse worked a number of positions at companies in the lumber business, ending up with Standale Lumber for 5.5 years.  Ultimately, Morehouse joined Lumbermen's in 1988.  *See* Morehouse Dep at 5-8.

Morehouse's testimony tends to support the notion that, from the standpoint of safeguarding and increasing Lumbermen's business, he constituted a more valuable resource than many, perhaps most others who are or were in the business – and Bouma knew that.  Specifically, Morehouse's testimony suggested that he knew well what lumber dealers (Lumbermen's customers) needed to

-23-

convince them to buy, because he was well versed in the products, prices, and sales strategies of the business. Morehouse had this exchange with counsel:

> Q.  And through your job as the manager and vice president of the Grand Rapids division of Lumbermen's you knew the dealers and the buyers in every single one of those lumber companies?
>
> A.  Correct.
>
> Q.  And many more customers of Lumbermen's as well, true?
>
> A.  Yes.
>
> Q.  And your relationship with those customers and those dealers was integral to the success of Lumbermen's in the Grand Rapids division?
>
> A.  That is correct.
>
> Q.  Why is that true?
>
> A.  I was the only manager that Lumbermen's had, has ever had, that came directly out of the lumber industry. They all came from some other facet, either from a manufacturer or something else, but I grew up and lived through the whole process of the lumber dealer. I knew exactly what the wholesale salesman was going to say when he came to the door because I was in charge of purchasing. I knew it from the ground up, so when I went in with our salespeople or by myself I knew exactly what to talk to the lumber dealers about because I've been there and I understood their needs and what they wanted. And that I felt was a very – you know, relationships was my most important forte in my makeup.

Morehouse Dep at 21-22. Consistent with Morehouse's characterization of his role and value, Bouma testified that Morehouse conveyed to Lumbermen's the preferences of individual sales contacts at Lumbermen's customers, and advised Lumbermen's who would be most effective in servicing a particular customer's account. *See* Bouma Dep at 81-82.

Following Morehouse's retirement from full-time employment in 1996, he continued to work about 20 hours per week for Lumbermen's until November 2004, mainly assisting the executive sales manager. Morehouse helped set up sales shows, and he attended the shows and traveled with the salesmen to help them make and handle contacts, improve their sales techniques, and generally

be a resource for them in any way he could.  *See* Morehouse Dep at 5-7 and 20.

By the time he retired entirely from Lumbermen's – only about ten months before his trip with Bouma – Morehouse personally knew all the managers and dealers at Zeeland Lumber, Standard Lumber, Standale Lumber, Ryeenga Lumber, and Hamilton Lumber.  *See* Morehouse Dep at 20-21.  Morehouse recalled at least two or three occasions, after his official retirement, where he served as an intermediary between Lumbermen's and one of its customers.  He recalled Bouma consulting him regarding Standale Lumber after his retirement, and said the consultation might have taken place during the September 2005 Ann Arbor trip but he could not remember for sure.  *See* Morehouse Dep at 24-25.  Bouma remembers that during the trip, he asked Morehouse about a buyer problem with Standard Lumber, as well as showing him new decking material and asking for his opinion.  *See* Bouma Dep at 49 and 55-56.

**On the other hand, the facts of our case are arguably distinguishable from the persuasive authorities on which State Farm relies to show that Bouma was acting within the scope of his duties when he took Morehouse to Ann Arbor.**  For example, there is no evidence or testimony that Bouma risked discipline or tangible financial consequence from the company if he did not take Morehouse on the football trip and discuss lumber business.  Certainly there were not the kind of tangible potential consequences that the *Leggett* employee might have faced if he did not attempt to find the company cell phone that he had misplaced.

Similarly, there is no evidence or testimony that Lumbermen's would be unable to obtain specific new business instead of a competitor, finish a project, or do something else time-sensitive or previously scheduled if Bouma did not take Morehouse on the football trip that weekend.  That stands in contrast to *Dixon*, where the employee had a literal and pressing need to fill the company

-25-

car with gasoline before a trip that was scheduled to take place the next day.

Each side has presented sufficient competent evidence, and logical argument, to support a finding on its side of the question whether Bouma was acting within the scope of his duties for Lumbermen's at the time of the accident. The verdict will come down to the jury's credibility determination, the relative weight of the evidence, and their own somewhat-subjective assessment of when a mixed leisure/business outing is within the scope of one's duties for the employer. Summary judgment for either side is not appropriate on this issue.

**If the Jury Finds that Bouma is an Insured under the Liberty-Lumbermen's Policy, How Should Liability be Apportioned Between the Liberty and State Farm Policies?**

State Farm seeks to pro-rate liability for the settlement between the State Farm-Lumbermen's policy and the Liberty-Bouma policy according to their respective limits. Liberty further contends that even if Bouma were an insured under Lumbermen's Liberty commercial umbrella liability policy, the Liberty policy is excess over the State Farm personal umbrella policy issued to Bouma.

Again, the State Farm-Bouma personal liability umbrella policy provides,

This policy is excess over all other valid and collectible insurance. When like coverage is written in another company, we will share in payments on a pro rata basis.

State Farm's MSJ at 4 (quoting Ex 2, State Farm Policy, Item 5 & Endorsement FE760.1).

The Liberty-Lumbermen commercial umbrella liability policy provides,

If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

State Farm's MSJ at 4-5; *see* Liberty's MSJ, Ex 1.

-26-

In Michigan, "[t]here are three layers or tiers of insurance coverage which determine the priority for payment:  primary coverage; excess 'other insurance' coverage; and 'true excess' or umbrella coverage."  *Meridian Security Ins. Co. v. Church Mut. Ins. Co.*, 2006 WL 1235091, *5 (E.D. Mich. May 8, 2006) (George C. Steeh, J.) (citing *Bosco v. Bauermeister*, 456 Mich. 279 (Mich. 1997)).  Within a specific tier or layer of coverage, liability should be prorated based on the total limits of available coverage within that tier of priority.  Once coverage within that tier is exhausted, the next tier of coverage will apply.  *Bosco*, 456 Mich. at 281-82 and 304.

The parties agree that neither of their policies provide true primary coverage.  The acknowledged primary insurer here was Old Republic, which issued Bouma's personal-liability umbrella policy and paid the $1 million limit of that policy.

Regarding the second tier of coverage, the majority view in Michigan requires an analysis of the respective "other insurance" provisions to determine the parties' intent and reconcile the provisions.  *Meridian*, 2006 WL 1235091 at *6.  The Michigan Supreme Court recognizes three categories of "other insurance" clauses: (1) pro rata clauses, which purport to limit the insurer's liability to a proportionate percentage of all insurance covering the event; (2) escape or no-liability clauses, which provide that there shall be no liability if the risk is covered by other insurance; and (3) excess clauses, which limit the insurer's liability to the amount of loss in excess of the coverage provided by the other insurance.[7]  *Saint Paul Fire & Marine Ins,. Co. v. American Home Ass. Co.*,514 N.W.2d 113, 115 (Mich. 1994) (Mallet, J., for a unanimous Court) (quoting *Fed. Kemper*

---

[7]

For an example of excess other-insurance, *see Wolverine WorldWide, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 705981, *3 (Mich. App. Mar. 8, 2007) (p.c.) (P.J. O'Connell & J. Markey) ("Defendant's policies only afford coverage in excess of the underlying primary insurance policy's annual limits of $50,000.  * * *  If plaintiff did not reach $50,000 in an annual period, coverage under the umbrella policies was not triggered."), *app. denied*, 740 N.W.2d 299 (Mich. 2007).

*Ins. Co., Inc. v. Health Ins. Admin. Co., Inc.*, 383 N.W.2d 590 (Mich. 1986) (Riley, J., for a unanimous Court)).

The parties agree that neither of their policies has an escape or no-liability clause, i.e., neither policy purports to exclude all coverage if the risk is covered by some other insurance.

The parties agree that Liberty's policy is an excess policy which nowhere contains the word "pro rata." *See* State Farm's Opp at 2 ("State Farm agrees with Liberty's position that the Liberty policy contains an 'excess' other insurance clause.").

So the dispute comes down to the characterization of State Farm's policy as pro-rata or excess. What is the consequence of each characterization? In the seminal case of *Saint Paul*, 514 N.W.2d 113, the Michigan Supreme Court held that when there is a dispute between a pro rata other-insurance policy and an excess other-insurance policy, and the clauses are not in conflict or mutually repugnant, the insurer with the pro rata other-insurance policy must cover all losses up to its policy limit before the other insurer incurs any obligation.

In *Saint Paul*, plaintiff Saint Paul's other-insurance clause read as follows:

[I]f the insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of all valid and collectible insurance against such loss . . . .

*Saint Paul*, 514 N.W.2d at 116. Similarly, defendant CNA's other-insurance clause read, in pertinent part:

If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy to a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss

*Saint Paul*, 514 N.W.2d at 116. The Supreme Court categorized Saint Paul and CNA's other-

-28-

insurance clauses as pro-rata clauses because their language "creates a formula for establishing the liability of the insurer when other, collectible insurance exists on a proportionate basis.  In other words, they are generally intended to become effective only when other valid and collectible *primary* insurance is available."  *Saint Paul*, 514 N.W.2d at 116 (citing *Jones v. Medox, Inc.*, 430 A.2d 488, 491 (D.C. App. 1981)) (emphasis added).

Finally, defendant American Home's other-insurance clause read as follows, in pertinent part:

> [W]ith respect to acts or omissions which occur prior to the inception date of the policy, the insurance hereunder shall apply only as excess insurance over any other valid and collectible insurance and shall then apply only in the amount by which the applicable limits of liability of this policy exceeds the sum of the applicable limits of liability of all such other insurance.

*Saint Paul*, 514 N.W.2d at 116 (footnote 16 omitted).  The Supreme Court categorized American Home's policy as an "excess other-insurance" policy because its language evinced "the insurer's intent that the policy only affords secondary coverage when the same loss is covered by 'other insurance.'"  *Saint Paul*, 514 N.W.2d at 116 (citation omitted).

Faced with two pro-rata other-insurance policies and one excess other-insurance policy, the Michigan Supreme Court had to figure out each insurer's relative liability, if any.  The Supreme Court began with the principle that the court should "refrain from rewriting the contracts and instead give effect to the meaning and intent of the policy language."  *Saint Paul*, 514 N.W.2d at 117 (citing *Upjohn Co. v. NH Ins. Co.*, 476 N.W.2d 392 (Mich. 1991) and *Eghotz v. Creech*, 113 N.W.2d 815 (Mich. 1962)) (footnote 22 omitted).

The Supreme Court recognizes two options where a pro-rata other-insurance clause confronts an excess other-insurance clause: (1) reconcile the clauses and give effect to the intent of the contracting parties, which would require the insurer with the pro rata clause to cover all losses up

to its policy limit (the majority view), or (2) find the clauses irreconcilable, disregard the contractual language, and require each insurer to pay in proportion to its policy limit's share of all the excess policy limits (the majority view). *Saint Paul*, 514 N.W.2d at 117-18 (footnote 23 omitted). The Supreme Court adopted the majority view, holding that a pro-rata other-insurance policy is primary to an excess other-insurance policy. *Saint Paul*, 514 N.W.2d at 119-21 (following *Jones v. Medox, Inc.*, 430 A.2d 488 (D.C. App. 1981) and rejecting *Lamb-Weston v. Oregon Auto. Ins. Co.*, 341 P.2d 110 (Or. 1959)). *See, e.g., American Auto Ins. Co. v. Transportation Ins. Co.*, 288 F. App'x 219, 225 (6th Cir. 2008) (McKeague, J.) ("Under Michigan law, a pro rata clause has priority over an excess clause.").

   **State Farm acknowledges this *Saint Paul* rule but merely argues that it is inapposite on the facts of this case because there is no pro-rata policy involved:**

> Nor does State Farm contest Liberty's assertion that, as between an "excess" other insurance clause and a "pro rata" other insurance clause, Michigan law enforces the intent of the parties with the pro-rata policy paying first (as intended, since such clauses seek to pro-rate with other available policies) and the excess policy paying second (as intended, since the excess clause provides coverage in excess over all other valid and collectible insurance and is "unavailable" for proration).

State Farm's Opp at 2. Rather, State Farm contends that both its policy and the Liberty policy are umbrella policies which are excess of the Old Republic primary policy, so they are in the same coverage layer. State Farm argues as follows,

> In such situations, Michigan law is clear. Upon the exhaustion of the limits of the primary Old Republic policy, the liability is to be apportioned between the State Farm and Liberty umbrella policies on the basis of the policy limits. *Pioneer State Mutual Ins. Co. v TIG Ins. Co.*, . . . 581 N.W.2d 802 ([Mich. App.] 1998).

> *Pioneer* arose from a boating accident. The allegedly negligent and responsible operator was insured by Pioneer under a watercraft liability endorsement contained in a personal liability policy issued to the operator's father who owned the boat. In addition, the negligent operator was insured under a personal liability policy issued

-30-

by TIG to his mother with whom he resided.  Both the Pioneer policy and the TIG policy provided that the coverage afforded by the policy was "excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply to this policy."  *Pioneer*, 229 Mich App at 408 [581 N.W.2d at 802].

The circuit court ruled in pertinent part that both Pioneer and TIG were obligated to share the liability on a 50/50 basis.  On appeal, the Court of Appeals affirmed, holding that the policies were in the same layer of coverage and that liability should be apportioned on the basis of the policy limits.

> Here, we are not confronted with two different "layers" of coverage. Rather, the excess provisions of both of the competing policies are, for all intents and purposes, essentially at the same "layer."  Under such circumstances, liability is to be apportioned on the basis of the policy limits.  Because both of the policies in this case provide a $500,000 limit on coverage, the trial court properly apportioned the settlement cost equally between Pioneer and TIG.

*Pioneer*, 229 Mich App at 415-16 [581 N.W.2d at 802].  *See also McGow v. McGurry*, 412 F.3d 1207, 1221 (11th Cir. 2005), where the court, applying Michigan law, held that two insurers with substantially identical "excess" other[-]insurance clauses must apportion liability according to their policy limits.

In the present case, the State Farm and Liberty umbrella policies contain "excess" other[-]insurance provisions.  The Liberty policy provides:

> If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. * * *  However, this provision will not apply if the other insurance is specifically written to be excess of this policy.  [*See* Comp, Ex 1]

The State Farm policy, following application of the . .. endorsement, provides:

> This policy is excess over all other valid and collectible insurance. When like coverage is written in another company, we will share in payments on a pro rata basis.

Simply stated, under Michigan law, policies containing "excess" other[-]insurance clauses share liability on a pro rata basis.  The State Farm amendatory endorsement conforms the policy to Michigan law by providing that, "when like coverage is written in another company [meaning coverage that is "excess over all other valid and collectible insurance"], we will share in payments on a pro rata basis."  These two policies, both of which are excess over all other insurance, must share liability

-31-

on a pro rata basis.

> [L]iability in excess of the primary policy coverage limits must be apportioned between State Farm and Liberty according to their coverage limits. As the [limit] of the State Farm policy [is] $3 million and the [limit] of the Liberty policy [is] $10 million, . . . State Farm is required to pay 3/13 of the excess liability, while Liberty is required to pay 10/13 of the excess liability. State Farm was liable for only 3/13 of the total sum paid in excess of the primary policy, and State Farm is entitled to recover the difference between the $3,000,000 advanced by State Farm and its actual liability for the settlement.

State Farm's MSJ at 15-17 (final ¶ break added).

**Liberty rejects the notion that both policies are in the same coverage layer. Liberty characterizes State Farm's policy as a pro rata policy which is primary to Liberty's excess policy.** *See* Liberty's Opp at 3-4. In other words, Liberty was not required to pay anything until State Farm paid its full $3 million policy limit, and Liberty need not reimburse State Farm for doing so. *See* Liberty's Opp at 4; *see, e.g., Citizens Ins. Co. of America v. American Mfrs. Mut. Ins. Co.*, 1998 WL 1991200, *3 (Mich. App. June 19, 1998) (p.c.) (P.J. White, Bandstra, Smolenski) ("Defendant's insurance policy provided coverage 'excess over any other collectible insurance.' Because plaintiff was a primary insurer of the Lincoln and paid a settlement within its policy limits, defendant was not required to reimburse plaintiff for half of that settlement.").

**Liberty argues as follows:**

> In an attempt to avoid well established Michigan law regarding the priority between a pro rata other[-]insurance clause and an excess other[-]insurance clause, incredibly, State Farm argues that although its other[-]insurance clause contains the language that our courts have specifically held renders it a "pro rata" clause, it is not a "pro rata" clause. Rather, State Farm argues that this language was merely added to "conform" the clause to Michigan law and clarify that if there are two policies with excess clauses they will stand pro rata. This argument is devoid of merit.

> First of all, pursuant to the terms of the State Farm policy, State Farm agreed that if there was like coverage (i.e. coverage similar to the State Farm coverage), then State Farm would share on a pro rata basis. Both the State Farm policy and the Liberty

policy are liability umbrella policies. Because the coverage available from Liberty is "like" the State Farm coverage, in its other insurance clause State Farm purported to share this loss on a pro rata basis. Thus, pursuant to Michigan law, the State Farm Policy's other[-]insurance clause constitutes a pro rata clause. [*St. Paul Fire & Marine Ins. Co. v. Am. Home Ass. Co.*, 444 Mich. 560, 566-67 (Mich. 1994)] To coin a phrase: if it looks like a duck, and quacks like a duck, it must be a duck. Likewise, if it looks like a pro rata clause, and acts like a pro rata clause, it must be a pro rata clause.

For State Farm to argue that it added this language to conform to Michigan Law is also disingenuous. Michigan law does not mandate a particular outcome. Pursuant to Michigan law, if there are two policies with excess other[-]insurance provisions, the insurers will share the loss on a pro rata basis. Thus, if State Farm had left its policy with a pure excess other[-]insurance provision, we would be dealing with two excess[-]insurance clauses which, pursuant to Michigan law, would result in pro rata sharing by the carriers. However, State Farm issued an endorsement to its policy which converted its other[-]insurance provision to a pro rata provision with respect to like coverage (i.e. other liability umbrella coverage such as the coverage provided by Liberty). Because State Farm converted its other[-]insurance clause to a pro rata clause, pursuant to Michigan law, as between the State Farm Policy and the Liberty Policy (which contains a pure excess other[-]insurance provision), the State Farm policy is treated as primary.

What State Farm is really arguing is that it added this language to its other[-]insurance clause to subvert – not conform to – Michigan law. In essence, State Farm is taking the position that its pro rata language is a directive or instruction to the courts of this State on how to interpret its other[-]insurance clause in relation to any other insurance policy. State Farm is asking that the Court find that, regardless of the type of other[-]insurance clause that may be found in the other policy (i.e. whether it be pro rata, escape or excess), the other insurer must be ordered to contribute to the loss on a pro rata basis with State Farm. Not only is this argument devoid of merit, it is contrary to Michigan case law! Pursuant to Michigan law, if a policy's other[-]insurance clause contains pro rata language, when it comes against a policy with a pure excess other[-]insurance clause it will be treated as primary coverage. It will *not* share on a pro rata basis.

For State Farm to suggest that it could, by the language in its policy, clarify how another carrier will have to contribute to a loss is ridiculous. As observed by the court in *Jones v. Medox, Inc.*, 430 A.2d 488 (D.C. App. 1981), in a situation such as this the two insurance companies have no contractual relationship. Therefore, one carrier cannot dictate another carrier's "other insurance" obligations. In fact, that is precisely what the Liberty Policy's other[-]insurance provision says:

> . . . Nothing herein will be construed to make this policy subject to

the terms, conditions and limitations of such other insurance.

Rather, it is for the courts, and not the insurers, to determine the priority of coverage. Pursuant to Michigan law, since the State Farm Policy's other[-]insurance clause purports to limit its liability to a proportionate percentage of the available insurance, it is a pro rata clause. Therefore, State Farm is considered primary coverage in relation to the Liberty Policy.

Liberty's Opp at 4-6. State Farm replies that the pro-rata clause addressed by the Michigan Supreme Court in *Saint Paul* did not state that it was excess over all other valid and collectible insurance; rather, the pro-rata clause there merely purported to limit coverage to a percentage of all available insurance. *See* State Farm's Reply at 7.

The court recognizes that since *Saint Paul*, a Michigan court "may no longer automatically declare competing 'other insurance' clauses repugnant without engaging in a careful scrutiny to honor the policies to the greatest extent possible." *Pacific Ins. Co. v. Cordova Chem. Co. of Michigan*, 2005 WL 1399728, *2 (Mich. App. June 14, 2005) (p.c.) (P.J. Hoekstra, Jansen, Kelly), *app. dis.*, 705 N.W.2d 113 (Mich. 2005). Having done so, **the court concludes that State Farm's argument has merit and Liberty's does not.**

State Farm's excess other-insurance clause may be inartfully worded, but Liberty's proposed reading of the clause is untenable. State Farm's policy provides, "This policy is excess over all other valid and collectible insurance. When like coverage is written in another company, we will share in payments on a pro rata basis." The excess provision in the first sentence is clear and unqualified. The second sentence does not somehow nullify the first sentence and render the policy not an excess policy.

This is because the term "like coverage" in the second sentence can only reasonably refer to one type of coverage: "coverage that is also excess over all other valid and collectible insurance."

-34-

Thus, the second sentence of State Farm's other-insurance clause effectively provides, "When *coverage that is also excess over all other valid and collectible insurance* [like coverage] is written in another company, we will share in payments on a pro rata basis", which is what the *Saint Paul* rule requires anyway when two excess-other-insurance policies meet.[8]

In other words, the second sentence of State Farm's other-insurance provision is superfluous; it merely commits State Farm to do by contract what established judicial construction would require it to do anyway when its excess policy confronts another excess policy of the same layer.  State Farm did not need to insert the second sentence, and, to avoid confusion like the current controversy, it would have been wiser to leave it out.[9]  But the fact remains that both the State Farm and Liberty

---

[8]

Liberty effectively takes the term "like coverage" to mean "other umbrella liability coverage", which is an unreasonable reading of the text of State Farm's other-insurance provision. The first sentence of State Farm's other-insurance provision states, "This policy is excess over all other valid and collectible insurance."  When the second sentence begins by referring to "like coverage", it is obviously and necessarily referring to coverage which, like the coverage just adverted to in the first sentence, is "excess over all other valid and collectible insurance."  There is no other possible antecedent for "like coverage."

Liberty belatedly tries to paint the issue of what "like coverage" means as "a red herring", *see* Liberty Reply at 5, but this dispute cannot be resolved with determining precisely what State Farm meant when it referred to "like coverage."

[9]

State Farm seems to acknowledge the avoidable headache that the addition of the *unnecessary* second sentence has caused it.  *See* State Farm's Opp at 10: "[B]oth policies provide that they are excess over all other valid and collectible insurance.  If both policies stopped there, there would be no dispute between these parties that the policies were irreconcilable and that liability must be prorated to their respective limits."

*Cf.* Liberty's Reply at 4:  "Pursuant to Michigan law, if there are two policies with excess other insurance provisions, the insurers will share the loss on a pro rata basis.  Thus, as Plaintiff itself acknowledges at page 10 of its response, if Plaintiff had left its policy with a pure excess other insurance provision, we would be dealing with excess other insurance clauses which, pursuant to Michigan law, would result in pro rata sharing by the carriers.  *There was no need for Plaintiff to 'clarify' how the two carriers would share the loss.*"  Emphasis added.

-35-

policies contain unequivocal statements that their policies are excess to all other valid, collectible insurance.  State Farm's policy simply goes on, perhaps unwisely, to spell out the undisputed allocation of responsibility that arises by operation of law when its policy confronts a like policy, i.e., a policy of equal priority.

Whatever the subjective motivations of those who drafted the State Farm policy – to "conform" their other-insurance clause to Michigan law or otherwise – as worded it constitutes an excess policy, not a pro rata policy.  Because the two policies are materially identical, they cannot be reconciled, and the only solution is to require both insurers to contribute to the settlement in proportion to their policy limits.  The Michigan Supreme Court anticipated this scenario in *Saint Paul*:

> We also acknowledge that it may be necessary to declare "other insurance" clauses irreconcilable when the applicable portions of the two other insurance clauses are identical excess clauses.  In the example presented, there is an actual problem with circularity.  Moreover, the literal interpretation of policies containing competing excess clauses would leave the insured without any coverage where it first appeared he had multiple coverage.[10]  In these cases, there is no rational reason to give the language of one policy preference over identical language in the other policy.

*Saint Paul*, 514 N.W.2d at 121 (citing *State Farm Fire & Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 268 N.W.2d 147, 149 (S.D. 1978) and *Hartford Ins. Co. v. Ky. Farm Bur. Ins. Co.*, 766 S.W.2d 75, 76-77 (Ky. App. 1989)).[11]

---

[10]

    *See, e.g., Dow Corning Corp. v. Continental Cas. Co., Inc.*, 1999 WL 33435067, *9 (Mich. App. Oct. 12, 1999) (p.c.) (P.J. Young, JJ. Murphy & Hoekstra) ("Dow Corning suggests that, if the 'other insurance' clause in every contract is applied as written, Dow Corning could never recover from any of its excess policies.  This would obviously be an absurd result.") (citing *Saint Paul*, 514 N.W.2d at 121).

[11]

    The same result obtains when competing policies both provide *primary* coverage.  *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1352 (6th Cir. 1996) (applying Michigan law).

Thus, *if* Bouma was an insured under Liberty's policy at the time of the accident, Liberty will be liable for 10/13 and State Farm will be liable for only 3/13 of the $8 million settlement remainder. In other words, State Farm's liability will be less than the $3 million it has already paid, and Liberty's liability will be *more* than the $5 million it has already paid. Liberty will be obligated to reimburse State Farm for the amount that State Farm paid over its share.

**Finally, Liberty belatedly argues that "[a]t a minimum, Plaintiff's other[-]insurance clause is ambiguous and, therefore, must be construed against Plaintiff and in favor of the insured." Liberty's Reply at 5.** Because Liberty did not make this argument in the opening brief supporting its motion for summary judgment, nor in its brief opposing State Farm's motion for summary judgment, the court need not consider it. "Ordinarily, this court will not consider arguments raised for the first time in a reply brief or surreply brief." *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *37 n.24 (W.D. Mich. 2008) (Paul L. Maloney, J.) (citing, *inter alia*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in . . . replies to responses.")). Raising an argument for the first time in a reply brief affords the other side no opportunity to respond. *ABC Beverage Corp. & Subsidiaries v. US*, 577 F. Supp.2d 935, 950 n.16 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *NLRB v. Int'l Health Care, Inc.*, 898 F.2d 501, 506 n.5 (6th Cir. 1990)).[12]

In any event, Michigan's rule that an ambiguous term is construed strictly *contra*

---

[12]

The rule is the same in Michigan state court. *Accord Maxwell v. DEQ*, 692 N.W.2d 68, 74 (Mich. App. 2004) ("Reply briefs may only contain rebuttal argument, and raising an issue for the first time in a reply brief is not sufficient to present the issue for appeal.") (citing MCR 7.212(G) and *Blazer Foods, Inc. v. Restaurant Props., Inc.*, 673 N.W.2d 805, 812-13 (Mich. App. 2003)), *app. denied*, 698 N.W.2d 392 (Mich. 2005).

*proferentem* (against the drafter, i.e., the insurer) is of no avail to Liberty.  The language in State Farm's clause, while atypical and imperfectly drafted, admits only one reasonable interpretation, so it is not ambiguous.  A finding of ambiguity is to be reached "only after 'all other conventional means of interpretation' have been applied and found wanting'", *Fluor v. Enters., Inc. v. Revenue Div.*, 730 N.W.2d 722, 727 n.3 (Mich. 2007) (Clifford Taylor, C.J.) (citing *Lansing Mayor v. Michigan PSC*, 680 N.W.2d 840, 846 (Mich. 2004)), and "where common words used in their ordinary fashion lead to one reasonable interpretation," as they do here, a contract "cannot be found ambiguous", *Klida v. Braman*, 748 N.W.2d 244, 248 (Mich. App. 2008), *app. denied*, 758 N.W.2d 888 (Mich. 2009).  *See, e.g., Niles Twp. v. Berrien Cty. Bd. of Comm'rs*, 683 N.W.2d 148, 160 (Mich. App. 2004) (P.J. Murray, concurring) (affirming Hon. Paul L. Maloney, Berrien Cty. Cir. J.) ("MCL 41.801(3) is not ambiguous for, when read harmoniously with subsections 2 and 4, it is not subject to more than one reasonable interpretation.").  When a term is not ambiguous, the *contra proferentem* rule never comes into play.  *See Royal Prop. Group, LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 435 n.8 (Mich. App. 2005) ("Because we conclude that the insurance policy is not ambiguous as to coinsurance, we need not address . . . the rule of *contra proferentem*.").

### ORDER

Having reviewed the parties' briefs and heard oral argument on January 6, 2009:

Plaintiff's motion for summary judgment [# 26] is **GRANTED in part** & **DENIED in part**.

Defendant's motion for summary judgment [# 25] is **DENIED**.

The court **DECLARES** that, under Michigan law:

(1)    **both parties' policies are "excess other-insurance" policies** at the same "tier" or

-38-

"layer" of coverage;

(2a)   **if Mr. Bouma was an insured under Liberty's policy**, Liberty and State Farm will be liable to contribute towards the settlement pro rata, i.e., in proportion to their respective policy limits, and Liberty will be obligated to reimburse State Farm for its overpayment towards the settlement (including statutory interest from the time of the filing of the instant complaint to the time of final judgment in this case);

(2b)   **if Mr. Bouma was *not* an insured under Liberty's policy**, Liberty will not be obligated to pay anything towards the settlement;

(2c)   there is a **genuine issue of material fact**, however, as to whether Mr. Bouma was an insured under Liberty's policy, i.e., as to whether he was acting within the scope of his duties for Lumbermen's, Inc., at the time of the accident.

(3)   If State Farm wins, it will be automatically entitled to statutory interest for the period from the filing of the complaint through the date of the judgment.

(4)   The court reserves decision on (a) whether State Farm can seek pre-complaint interest (i.e., interest from the date that State Farm overpaid towards the underlying settlement through the day before the complaint was filed) notwithstanding its failure to expressly pray for pre-complaint interest in its complaint, (b) whether the court or the jury would decide whether to award pre-complaint interest, and (c) how pre-complaint interest should be calculated.

No later than Friday, April 10, 2009, the parties **SHALL** jointly file a notice which advises the court how they wish to proceed.

This is <u>not</u> a final and immediately appealable order.[13] *Aslani v. Sparrow Health Sys.*, 2009 WL _____, *__ (W.D. Mich. Mar. 12, 2009) (Maloney, C.J.) and *Griffin v. Reznick*, – F. Supp.2d –, –, 2008 WL 5110528, *10 (W.D. Mich. 2008) (Maloney, C.J.) ("'Absent certification of an interlocutory appeal under 28 U.S.C. § 1292(b) or Fed. R. Civ. P. 54(b), an order disposing of fewer than all parties or claims is nonappealable.'") (quoting *Bd. of Ed. of Avon Lake City Sch. Dist. v. Patrick M.*, 2000 WL 712500, *4 n.5 (6th Cir. May 24, 2000) (citing *Wm. B. Tanner Co. v. US*, 575 F.2d 101, 102 (6th Cir. 1978))).

**It is so ordered this 16th day of March 2009.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

[13]

After the January 6 hearing on the instant motions, this court held a final pretrial conference on January 20 and issued a pretrial order on January 23 [document numbers 43 and 44]. State Farm filed motions *in limine* on February 2 [document numbers 45 and 46], to which Liberty responded on February 9 [document numbers 49 and 50]. On February 10, 2009, State Farm filed notices of video deposition as to Henry Bouma and his wife Carolyn Bouma [document numbers 51 and 52].

Jury trial was scheduled to commence on February 24, 2009, but counsel telephoned chambers and informed the court of an agreement reached between the parties. The parties agreed that after the issuance of the instant opinion resolving their summary-judgment motions, they will enter a "settlement" of sorts of the remaining issues so that they can presently appeal this decision to the Sixth Circuit. Accordingly, by order dated February 18, 2009, this court vacated the trial date *sine die* [document #53].